# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. <u>1:18-cv-01068-WJM *SEALED*</u>

**JOHN DOE**, individually; and

**RICHARD ROE**, individually;

      Plaintiffs;

v.

**COLORADO COMMUNITY COLLEGE SYSTEM**;

**TRINIDAD STATE JUNIOR COLLEGE**, a subdivision of COLORADO COMMUNITY COLLEGE SYSETM;

**ROBERT MARTINEZ**, individually and in his official capacity as D*ean and Title IX Investigator* with the COLORADO COMMUNITY COLLEGE SYSTEM and TRINIDAD STATE JUNIOR COLLEGE;

**CASEY SACKS**, individually and in her official capacity as *Dean and Investigator* with the COLORADO COMMUNITY COLLEGE SYSTEM and TRINIDAD STATE JUNIOR COLLEGE;

**DENNIS TRUJILLO JOHNSON**, individually and in his capacity as the *Designated Student Services Officer* with the COLORADO COMMUNITY COLLEGE SYSTEM and TRINIDAD STATE JUNIOR COLLEGE;

**KERRY GABRIELSON**, individually and in her capacity as the V*ice President of Student Services* with the COLORADO COMMUNITY COLLEGE SYSTEM and TRINIDAD STATE JUNIOR COLLEGE;

**LORRIE VELASQUEZ**, individually and in her capacity as the *Title IX Coordinator* with the COLORADO COMMUNITY COLLEGE SYSTEM and TRINIDAD STATE JUNIOR COLLEGE;

**MICHELLE BLACK**, individually and in her capacity as the *Director of Student Life* with the COLORADO COMMUNITY COLLEGE SYSTEM and TRINIDAD STATE JUNIOR COLLEGE;

**MATT YOUNG**, individual and in his capacity as the *Director of Housing* with the COLORADO COMMUNITY COLLEGE SYSTEM and TRINIDAD STATE JUNIOR COLLEGE.

Defendant(s).

---

## COMPLAINT WITH JURY DEMAND

---

I.    NATURE OF THE CASE ................................................................................... 1

II.   JURISDICTION AND VENUE ......................................................................... 1

III.   BACKGROUND FACTS .................................................................................. 4

   A.   THE TRINIDAD STUDENT HANDBOOK ................................................... 31

IV.   CLAIMS AND CAUSES OF ACTION ............................................................ 34

   B.   FIRST CLAIM FOR RELIEF (*CLAIM FOR RACE-BASED DISCRIMINATION PURSUANT TO 42 U.S.C. § 1981 – INDIVIDUAL DEFENDANTS IN INDIVIDUAL CAPACITIES*) ..................................................................................... 34

   D.   SECOND CLAIM FOR RELIEF (*DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF – ALL DEFENDANTS*) ........................................................ 39

V.   DAMAGES .................................................................................................... 42

VI.   REQUEST FOR RELIEF ................................................................................. 42

Plaintiff JOHN DOE ("Mr. Doe" or "Plaintiff 1"), who appears individually, Plaintiff RICHARD ROE ("Mr. Roe" or "Plaintiff 2") (collectively, "Plaintiffs"), hereby respectfully file this action against the above-captioned defendants, through the undersigned counsel of record Kishinevsky & Raykin, Attorneys at Law, and state on information and belief as follows.

## I.      NATURE OF THE CASE

This action seeks redress for violations of, and seeking redress under, federal law, including but not limited to the United States Constitution, 42 U.S.C. §§ 1981, 1983, 1985, 1988, and 2000c-8, 20 U.S.C. § 1681, for discriminatory conduct in a public education disciplinary setting, as well as under Colorado law-based claims including but not limited to breach of contract, stemming from a consensual sexual experience between three persons but resulting the expulsion from school of only the male participants.

## II.      JURISDICTION AND VENUE

1.      Plaintiff John Doe is a resident of Taos County, New Mexico.

2.      Plaintiff Richard Roe is a resident of Taos County, New Mexico.

3.      Defendant Colorado Community College System (herein "CCCS" or "System") is Colorado's largest system of higher education, serving approximately 137,000 students annually at thirteen colleges and thirty-nine locations across Colorado.  The CCCS is an educational subdivision of the State of Colorado with its principal place of business located at 9101 East Lowry Boulevard, Denver, Colorado 80230.  The Colorado General Assembly created the System in the Community College and Occupational Education Act of 1967, C.R.S. § 23-60-101 *et seq.*, and is a public, post-secondary school, C.R.S. § 23-60-103.

4.     The System is governed by a nine-member State Board for Community Colleges and Occupational Education.  The Board is unique in the nation, with responsibility for both secondary and post-secondary career and technical education and community college governance.  Members are appointed by the Governor and confirmed by the State Senate.  The System's mission is to serve Colorado residents who reside in their service areas by offering a broad range of general, personal, career, and technical education programs.

5.     Defendant Trinidad State Junior College ("Trinidad," the "School," or "College") was the first community college in Colorado.  It maintains several Colorado-based campuses, with its primary campus located at 600 Prospect Street, Trinidad, Colorado 81082.  Trinidad is based in Las Animas County, Colorado.  The School is a subdivision of the CCCS.

6.     Defendant Carmen Simone ("Ms. Simone") is the President of Trinidad State Junior College.  On information and belief, Ms. Simone is a citizen and resident of Colorado.

7.     Defendant Robert Martinez ("Mr. Martinez") was the Dean and Title IX Investigator with the System and School at the time of the Title IX Investigation in this Complaint.  On information and belief, Mr. Martinez is a citizen and resident of Colorado.

8.     Defendant Casey Sacks ("Ms. Sacks") is the Dean and Investigator with the System and School.  On information and belief, Ms. Sacks is a citizen and resident of West Virginia.

9.     Defendant Dennis Trujillo Johnson ("Mr. Trujillo Johnson") is the Designated Student Services Officer with the System and College.  On information and belief, Mr. Trujillo Johnson is a citizen and resident of Colorado.

10.     Defendant Kerry Gabrielson ("Ms. Gabrielson") is the Vice President of Student Services with the System and School.  On information and belief, Ms. Gabrielson is a citizen and resident of Colorado.

11.     Defendant Lorrie Velasquez ("Ms. Velasquez") is the Title IX Coordinator with the System and School.  On information and belief, Ms. Velasquez is a citizen and resident of Colorado.

12.     Defendant Ms. Michelle Black ("Ms. Black") is the Director of Student Life with the School.  On information and belief, Ms. Black is a citizen and resident of Massachusetts.

13.     Defendant Matt Young ("Mr. Young") is the Director of Housing with the School. On information and belief, Mr. Young is a citizen and resident of Colorado.

14.     The court has personal jurisdiction over the parties because Plaintiffs filed in this Court and because the Defendants are subject to general jurisdiction in Colorado or, alternatively, at a minimum for the specific conduct alleged herein occurring here.

15.     The amount in controversy exceeds $75,000.00 for each of Plaintiffs' respective claims.

16.     The court has jurisdiction over this action pursuant to: (a) 28 U.S.C. § 1331 based on the federal question claims described below including but not limited to 42 U.S.C. § 1981 and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq.* (herein "Title IX"); and 28 U.S.C. § 1332 because of the complete diversity of residences, citizenship, and domicile between the plaintiffs and defendants in this action and amount in controversy exceeding $75,000.00 per plaintiff, respectively, not including interest and costs; and 28 U.S.C. § 1367 for supplemental jurisdiction over state-based claims including but not limited to breach

of contract.  The Court's exercise of jurisdiction in this matter would satisfy both C.R.S. § 13-1-124(1)(a) and the Due Process Clause of the Fourteenth Amendment.

17.     Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b), pursuant to subsections 1 and 2, based on the residences of the defendants and/or a substantial part of the events or omissions giving rise to Plaintiffs' claims occurring in Las Animas County, Colorado.

## III.     BACKGROUND FACTS

18.     As of February 2015 and for several months prior to that, Plaintiffs were students at the College.

19.     As students at the College, Plaintiffs had a valid contract with the College.

20.     The contractual relationship between the Plaintiffs and the College involved the Plaintiffs' payments of tuition in exchange for educational services offered by the College.

21.     The contract incorporated the terms of the Student Code of Conduct and the Student Handbook.

22.     In the early morning of February 28, 2015, Plaintiffs had sex with a fellow College student, Ms. Megan Poe ("Ms. Poe").

23.     Ms. Poe, who was 20 years old at the time, subsequently claimed that Plaintiffs sexually assaulted her.  Ms. Poe would go on to file a Title IX Complaint ("Title IX Complaint") with the College.  She also filed a police report ("Police Report") with the Trinidad Police Department ("Trinidad Police") and went to a Pueblo hospital ("Hospital"), where a Sexual Assault Nurse Examiner ("SANE") performed a "rape kit" examination on her.

24.     On April 6, 2015, Mr. Martinez and Ms. Sacks (collectively, "Title IX Investigators"), both of whom are Title IX Investigators with the College, came out with their findings in a Title IX Report ("Title IX Report").

25.     The Title IX Report made several findings based on numerous pieces of evidence.

26.     It identified ten witnesses, all of whom the Investigators interviewed.

27.     According to the Title IX Report, Ms. Poe admitted that she started drinking on the evening of February 27, 2015, along with several witnesses: W1 ("W1"), W2 ("W2"), WS ("WS"), and W6 ("W6"). She started drinking several hours before she met with the Plaintiffs.

28.     Ms. Poe, who was not of legal drinking age at the time, had two margaritas at 10:30 PM. She and W2, WS and W6 went to an off-campus party later that night, and Ms. Poe was observed carrying around a bottle of tequila. Ms. Poe reported drinking two beers at the party, but W6 said she saw her drink a Four Loko, which is a malt beverage, and at least one shot of tequila. Ms. Poe and three other women returned from the party and went to O'Conner Hall ("O'Conner Hall") together around midnight.

29.     The Title IX Report claimed that Ms. Poe reported that she had "approximately four drinks over a four-to-five-hour period before she went to the (Plaintiffs') room." The Title IX Report further found that, "While reported to be emotional, Ms. Poe was likely intoxicated and not incapacitated at the time she went to (Plaintiffs') room."

30.     The evidence as to how intoxicated Ms. Poe was that night – if at all – is inconsistent. W3, W6 and W7 claimed that she was "drunk," while W1 described her as "sober," according to the Title IX Report. Moreover, Ms. Poe herself stated that she was not drunk after attending the party before going over to the see the Plaintiffs. In fact, Ms. Poe

"was able to have two conversations with a security guard and carried on conversations with W4 and another with W5," according to the Title IX Report. The witnesses and the security guard ("Security Guard") "said her speech was clear and organized coherently." The Security Guard "went so far as to say he would not have described her as impaired at all."

31.     The tally shows that three witnesses claimed that she was drunk, while three student witnesses, the College Security Guard, and Ms. Poe herself claimed that she was not drunk. The Title IX Report, then, used the claims of three witnesses over five other witnesses' accounts, including one of its own officers, in determining that Ms. Poe was intoxicated when she went to the Plaintiffs' room several hours later.

32.     At 12:30 A.M. on February 28, Ms. Poe announced to W3 and W2 that she was going to Huggins Hall ("Huggins Hall") to talk to a male student. This man is identified as "WS" but is known to Plaintiffs as Brian Molina ("Mr. Molina"), who was both a friend of Plaintiffs and a person in whom Ms. Poe was romantically interested.

33.     After speaking to Mr. Molina that early morning, Ms. Poe was upset and crying because Mr. Molina told her that he was not romantically interested in her. The Title IX Report did not make this rebuffed romantic advance clear, but the Title IX Investigators knew this at the time and yet omitted entirely this critical detail from the Title IX Report.

34.     Later than morning, Mr. Roe approached Ms. Poe in the game room of Huggins Hall and asked, "Where are your hot friends? They should come over so we can drink." This indicates that Mr. Roe was more interested in Ms. Poe's friends than he was in her. It further indicates that Mr. Roe made his intentions clear to Ms. Poe that he wanted to consume alcohol with her and her friends at that point.

35.     Ms. Poe called W2 to ask if she wanted to drink in Huggins Hall with Mr. Roe, and W2 said no.  At this point, Mr. Roe left.

36.     This indicates that Ms. Poe herself was interested in consuming alcohol at that point, and that she particularly was interested in consuming alcohol with Mr. Roe.

37.     Around this time, W4 ("W4") saw Ms. Poe crying in the game room and talked to her for a while.  While they were talking, the Security Guard saw Ms. Poe and W4, and then he reminded them that visitation hours were over.

38.     W4 then escorted Ms. Poe outside at 2:02 AM on the morning of February 28 and drove her back to O'Conner Hall.  W4 reported that he saw Ms. Poe go into the hall and observed her on the phone at the time.

39.     Ms. Poe went to her room, where her roommate was asleep, and she watched television.  At 2:13 AM, Mr. Roe called her and invited her over, and he called her again at 2:21 AM.

40.     Ms. Poe knew that Mr. Roe had a dormmate, Mr. Doe.

41.     At 2:36 AM, she was observed on video ("Video") being let into Huggins Hall by Mr. Roe.

42.     The College has since negligently, recklessly or intentionally lost the Video, so all remarks about what was on the Video do not come from the Video itself, but instead are based on the recollections of people who purportedly saw the Video.

43.     In the dorm room of Mr. Doe and Mr. Roe at Huggins Hall, Ms. Poe began to drink with Plaintiffs.  Ms. Poe claims that she became intoxicated, and the Title IX Report states,

"She reports that her memory was compromised after the first four shots and she started not feeling well. Complainant (Ms. Poe) remembers subsequent events in bits and pieces."

44.     The Title IX Report claims that when Ms. Poe was drinking rum with the Plaintiffs. "She reported an additional approximately 4 shots in a 5 minute time period."

45.     The Title IX Report then concluded, "At this point it does seem plausible, based on our preponderance standard, that the Complainant could have initially been intoxicated and moved into incapacitation as the effects of an additional 4 potentially more drinks entered her system."

46.     Ms. Poe claims that the Plaintiffs "made her continue to drink from the rum bottle," according to the Title IX Report.  What is unclear is how Ms. Poe was "made" to drink.  She was voluntarily intoxicated earlier in the night, she was invited over to the Plaintiffs' room to drink, she went there knowing that she was going to drink and planning on drinking, and she herself began to voluntarily drink.  At no point did Ms. Poe ever claim that she was physically forced to consume alcohol, and there is no evidence that anything like this ever happened.

47.     Even the Title IX Report itself was skeptical of Ms. Poe's claim that she was made to drink, given that Ms. Poe equates being "made" to drink with "encouraging her to take more shots of rum and feeling like there were two people pressuring her though not using force get her to drink."

48.     While in the Plaintiffs' dorm room, Ms. Poe removed her clothes, but the Title IX Report claims that "she does not remember how her clothes or the Respondents' clothes came off."  There is no evidence that Plaintiffs ever forcibly removed Ms. Poe's clothes.

49.     At some point during this time period, sexual activity commenced between Ms. Poe and the Plaintiffs.  Ms. Poe reported that both Plaintiffs had sex with her vaginally.

50.     She further claimed that Mr. Doe pushed her head down and forced her to perform oral sex on him.

51.     Ms. Poe claims that while the Plaintiffs were having sex with her, she uttered at one point, "Can I go to sleep now" and that Plaintiffs would not let her leave until they both ejaculated.  From the Title IX Report, it is unclear if one or both of the Plaintiffs had insisted on this.

52.     Eventually, Ms. Poe and the Plaintiffs got dressed and left Huggins Hall together at 4:25 AM on February 28.

53.     In her own Police Complaint, Ms. Poe claims that, "I threw my clothes on as fast as I could and left."

54.     While outside, Mr. Doe was talking to Ms. Poe while Mr. Roe was smoking in a car.

55.     Ms. Poe claims that she yelled at them, "How could you do this to me?  What did I do to deserve this?"  Because the College does not have the Video, which was in its control and never in the control of Plaintiffs, this is impossible to objectively verify.

56.     According to reports regarding the Video, Ms. Poe fell outside and, according to the Title IX Report, "was following the (Plaintiffs) and yelling at them."  It is unclear how the Title IX investigators could determine that Ms. Poe was yelling at them, given that the Video does not have any audio.

57.     In her own Police Report, Ms. Poe claims that she had to go to Mr. Doe's car to retrieve her phone.  It is unclear why her phone was in Mr. Doe's car.

58.     At 4:55 AM, the Video purports to show that the Plaintiffs were running back to Huggins Hall away from Ms. Poe.   This means that Ms. Poe and the Plaintiffs were communicating for 30 minutes while outside of Huggins Hall.

59.     At 4:56 AM, the Video purports to show that Ms. Poe was following the Plaintiff to Huggins Hall.

60.     At 4:59 AM, the Video purports to show that Ms. Poe returned to her dorm at O'Conner Hall.

61.     W1 described Ms. Poe as drunk when she arrived home at 5:00 AM, and W2 described slurred speech, difficulty walking and vomiting more than once at 5:30 AM.

62.     The Title IX Report states, "When (Ms. Poe) told W1, W2 and W3 about the incident, the women said that their impression was that initial sexual contact may have been consensual and that during the course of events (Ms. Poe) told the (Plaintiffs) to stop.  It is unclear when this happened as (Ms. Poe) cannot recall events from the night and the (Plaintiffs) have provided no statement."

63.     It is important to note that the Title IX Report called W3 one of "the two most credible witnesses," along with W6.  The Title IX Report noted that, "W3 appeared to have a mild dislike of (Ms. Poe) because of (Ms. Poe's) history of inappropriate behavior."

64.     It was only this one time that the Title IX Report mentioned Ms. Poe's history of inappropriate behavior, which history would be a critical part of the investigation, since it

would speak to Ms. Poe's intentions and state of mind.  But the Title IX Report completely glossed over this critical information.

65.     There are two additional pieces of important information here.  One, Ms. Poe told at least three witnesses that the sex with the Plaintiffs was consensual.  Two, Ms. Poe could not provide reliable evidence that she ever told the Plaintiffs to stop during the sexual intercourse.  She only mentioned that she inquired of them whether she could go to sleep.  She never reported that the Plaintiffs precluded her from going to sleep.

66.     Ms. Poe told friends immediately following the sex that the Plaintiffs had "taken advantage of her" – but there is no evidence that she told any of her friends that she was raped.

67.     In fact, the Title IX Report claims that what seems questionable about Ms. Poe's narrative "is about consent when the sex acts started.  (Ms. Poe) said to Investigators she does not recall how events got started but witnesses who spoke with her immediately following the event all seemed to be under the impression that initially there was some consent on the part of (Ms. Poe) and that she changed her mind during the course of events."

68.     The Title IX Report further states that, "When pressed on follow up (Ms. Poe) firmly sticks to her initial narrative and claims not to remember more about events of the evening."

69.     Besides the Title IX Report, the College had various other reports.  There are numerous inconsistencies among those reports.

70.     One noteworthy report came in to the College's Maxient System ("Maxient Report") on February 28 at 8:42 PM.  This Maxient Report was generated roughly 14 hours

after Ms. Poe left the Plaintiffs' dorm room.  It is unclear who wrote this report, although it is clear it was not Ms. Poe.

71.     The Maxient Report claims that Ms. Poe went to the Plaintiffs' room at 2:30 in the morning "to talk and hangout."  It omits the fact that Ms. Poe was going over there to drink.

72.     The Maxient Report claims that the Plaintiffs "pushed her around."  Ms. Poe never used language like that in her own Police Report.

73.     The Maxient Report further claimed that "both guys were taking turns forcing sex upon her."  Ms. Poe never used the term "force" in her Police Report.

74.     That is at least two separate occasions in which the College manufactured its own conclusions of physical coercion against Ms. Poe despite the fact that she never claimed such physical coercion herself.

75.     The Maxient Report states that, "At first (Ms. Poe) was going with the sex but after a while she didn't want to anymore so she told the boys she wanted to sleep but they didn't listen and they kept going."  This further reinforces that the sex started as consensual. Additionally, Ms. Poe herself never claimed that she told the Plaintiffs that she wanted to sleep or that they heard her.  Rather, in her report she wrote that she asked whether she could sleep, and she gave no indication as to whether the Plaintiffs heard her.  She also did not give any indication that the Plaintiffs stopped her from going to sleep.

76.     The Maxient Report further claimed that there were injuries.  In fact, there was no evidence of any kind of physical injury, according to the SANE report, anywhere on Ms. Poe's body.

77.     Thus, in addition to manufacturing evidence of physical coercion where there was none, the College also was manufacturing evidence of physical injury where there was none.

78.     There also was a February 28, 2015, report ("February 28 Report") from a witness. It claimed that Ms. Poe sustained injuries.  Again, there was no evidence of injuries on Ms. Poe.

79.     Ms. Michelle Black ("Ms. Black"), the College's Director of Student Life, generated another report ("Black Report").  Ms. Black wrote that she received a text from Mr. Matt "Moose" Young ("Mr. Young"), the College's Director of Housing, at 1:38 PM on February 28, saying there was a "sexual assault that morning" – not an alleged sexual assault. Ms. Black also writes that there was a "victim" – rather than an accuser.

80.     All of this language regarding physical coercion, phantom injuries, an actual assault rather than an alleged assault, and a victim rather than an accuser framed the investigation against the Plaintiffs and biased it against them right from the start.

81.     Ms. Black was saying that the information that Mr. Young "was getting from (Ms. Poe) was bad."

82.     Ms. Black texted Ms. Kerry Gabrielson ("Ms. Gabrielson"), the College's Vice President of Student Services, at 2:33 PM on February 28 to "let her know that Matt was dealing with a sexual assault."  Again, at this point, the College already was assuming that an actual sexual assault had taken place.  Ms. Black's statement indicates predetermination of the Title IX investigation and immediately slanted the investigation against Plaintiffs.

83.     Ms. Black claimed the staff at the Trinidad hospital were not properly trained in how to do a rape kit, so Ms. Poe would have to travel to Pueblo or Denver.

84.     Ms. Black indicated that, at that point, Ms. Poe had spoken to the police but had not decided on pressing charges.

85.     This is noteworthy, as it makes it clear that, as of February 28, Ms. Poe had not decided on her own to press charges against either of the Plaintiffs.

86.     Ms. Black claimed that Ms. Poe was receiving harassing phone calls and that "many were anonymous."  She claims that four of them were from a friend of Mr. Doe's.  There is no evidence that the College ever followed up on these alleged calls, no evidence that these calls took place, and no evidence that Plaintiffs were involved in these calls if they were actually made.  There certainly is no evidence that the College ever collected phone information from Ms. Poe.

87.     Ms. Black claims that when she spoke to Mr. Doe on March 1, she said she knew him, Mr. Roe and Ms. Poe "too well to be neutral with this situation…"  Given Ms. Black's repeated use of accusatory language against Plaintiffs prior to March 1, this is obvious.  What is not as clear is why Ms. Black, if she knew she could not be a neutral in this situation, was making very strong accusations beforehand that would prejudice the investigation against the Plaintiffs.

88.     Ms. Black was instrumental in the initial stages of the System and School's investigation and played an active role in coaching the purported victim in what to say.  Ms. Black generated a summary report of her actions indicating support for the purported victim. She reached out to various Title IX personnel and campus security, which set the stage for the investigation.  Ms. Black was the recipient for all incident reports for the System and School.

89.     The College produced another report on March 1, 2015 ("March 1 Report"), which includes numerous witness statements.

90.     This March 1 Report claims that when Ms. Poe arrived at her dorm, she stated, "I am done with life ... they got me drunk and took advantage of me … Why does this always happen to me?  Why do I get treated this way?  Where are pills that (I) can take?"

91.     There is no evidence that the College closely investigated – or investigated at all – Ms. Poe's critical vocalized question, "Why does this always happen to me?"  If Ms. Poe was claiming to be the victim of other sexual assaults, then the College had a significant duty to investigate whether any of these alleged assaults had taken place on campus.  Equally important is the question of whether Ms. Poe had a history of making accusations – baseless or otherwise – against other males.

92.     The March 1 report also claims that she said, "They got me drunk, kept giving me shot after shot…At first I said it was ok, but it didn't register to me until a while and when it did, I was telling them to stop but I was so weak I couldn't fight for myself."

93.     This is the first time that any mention is made that Ms. Poe told the Plaintiffs to "stop" in the middle of a sex act.  In fact, on the very next day of March 2, when Ms. Poe filed her Police Report, she made no mention at all that she ever told the Plaintiffs to stop.  The only thing that Ms. Poe claimed she verbalized was a question, "Can I go to sleep now?"

94.     One particular witness claims in the March 1 Report that Ms. Poe was "a little intoxicated" at this point.

95.     This witness further claims that she went to O'Connor Hall to confront the Plaintiffs at 5:30 in the morning.  This witness claims that she and someone else went to the Plaintiffs'

room and "started knocking loudly waiting to hear from them or them to open the door.  We had no response so after giving it time, we had left around 6:40-7."

96.      It is unclear how these witnesses would have been able to get into O'Connor Hall in the first place, given that they did not live there, and how they could loudly knock on a door for up to one and a half hours without having anyone in neighboring rooms hear them, confront them or call security.  It further is unclear why the witnesses themselves did not call security at that point.

97.      Mr. Young also provided his statement in this March 1 Report.  Mr. Young claimed that he was told by Ms. Poe and another witness that Ms. Poe was "attacked" by the Plaintiffs.

98.      Mr. Young contacted Ms. Black after speaking to the women.  Mr. Young claimed that Ms. Poe told him that the Plaintiffs would not let her leave.  Ms. Poe never made this claim in her own Police Report.  In fact, she wrote in that Police Report, "I threw my clothes on (as) fast as I could and left."  She would spend another thirty minutes talking to the Plaintiffs outside Huggins Hall after she left.

99.      Mr. Young encouraged Ms. Poe to press charges.  He additionally reported the purported assault to local police.  In his summary report provided via the Incident Reporting Form that the purported victim had "injuries" despite there being no injuries as later determined by the hospital.  Hence, Mr. Young lied on his incident report.

100.     He later gave a statement to police.

101.     He claimed there were injuries, but it is unclear to which injuries he was referring, given that Ms. Poe was not found to have any physical injuries.

102.    Another student also contributed to the March 1 Report.  This student noted that Ms. Poe attempted to throw up, but at no point did she actually throw up.  She further indicated that Ms. Poe had no injuries.

103.    March 2, 2015, is the date that Ms. Poe provided her Police Report to the police.

104.    In her Police Report, she never claimed that she was forced to perform any sexual act.  Rather, she wrote, "I was scared because they were talking Spanish and laughing a lot of the time, and I didn't know what they were saying."  In other words, her sole basis for being "scared" was that the Plaintiffs were speaking Spanish.  Both Plaintiffs are of Latino descent. The College had the Police Report prior to completing its own Title IX Report and prior to expelling the Plaintiffs, and the College knew that Plaintiffs are of Latino descent.

105.    In that same Police Report, Ms. Poe claimed, "I remember tearing up, but not to the point that they noticed."

106.    She claimed that she asked, "Can I got to sleep now?"  But she does not recall an answer.  At no point in her report does Ms. Poe claim that she told the Plaintiffs "no" or instructed them to stop.

107.    Ms. Poe provided oral and written testimony to the Investigators.

108.    Both Plaintiffs met with Ms. Lorri Velasquez ("Ms. Velasquez"), the College Title IX Coordinator, and with Mr. Martinez, who is a disciplinary dean at the College in addition to being a Title IX Investigator, on Monday, March 2, 2015, to discuss interim action being taken as a result of Ms. Poe's accusations.

109.    After that date, due to severe pending criminal charges, the Plaintiffs would not again meet with Title IX Investigators or speak with them.

110.    On March 3, 2015, the Plaintiffs were still allowed to attend their classes, eat their meals on campus and participate in soccer – for which they both had scholarships.  Although the College would not allow them to continue to live on Campus, it agreed to provide off-campus housing at the College's expense and also provide transportation at the College's expense.

111.    On March 5, 2015, however, both Plaintiffs were suspended from the College on an interim basis.  In addition to being suspended from actual classes, the Plaintiffs were kicked out of housing, prevented from getting their meals and kicked off the soccer team.  The College was no longer willing to pay for housing and transportation, so the Plaintiffs would have to fend for themselves.

112.    Ms. Gabrielson was copied on Plaintiffs' notifications regarding the suspensions. Hence, on information and belief, Ms. Gabrielson was involved in the interim action suspending Plaintiffs from the System and School.  As Ms. Velazquez oversees the System and School's Title IX program, on information and belief, she was involved in the decision to suspend Plaintiffs.

113.    The College had an extreme change in direction in the brief period between March 3 and March 5 because it was retaliating against the Plaintiffs and attempting to intimidate them into cooperating with the investigation, even though the College knew the Plaintiffs were facing severe criminal charges.

114.    Ms. Velasquez told the Plaintiffs on March 3 that they would have to be interviewed by Investigators Ms. Sacks and Mr. Martinez on March 4.  When the Plaintiffs did not disclose any information to the Investigators on March 4, the College retaliated against them by

stripping them of their education, their athletic opportunities, their meals and their housing – despite the fact that there was no new evidence of wrongdoing that the College obtained between March 3 and March 5.

115. The Title IX Report ultimately was produced on April 6, 2015, and it was based on numerous pieces of evidence, including the various other reports that had been collected.

116. The Title IX Report claims that Ms. Poe "seems believable." This is an incredible claim in light of the fact that the Title IX Report previously observed inconsistencies between Ms. Poe's claims that the sex was not consensual versus her reports to several witnesses that the initial sex was consensual. It also is an incredible claim because the Title IX Report concludes that Ms. Poe was "incapacitated" by the time she returned home in the early morning. The reports of this alleged incapacitation were highly inconsistent.

117. The Title IX Report claims that Ms. Poe's claims are "strengthened by reporting to the police and by obtaining a SANE examination." The Investigators claimed that, "At the time of this report, neither of those documents are available to Investigators for review." This is factually false. The College could have easily asked Ms. Poe to sign a limited release under the Health Insurance Portability and Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936 (Aug. 21, 1996) (codified primarily in titles 18, 26, and 42 of the United States Code) ("HIPAA"), which would have given the College access to the SANE report. The College also could have asked Ms. Poe to get a copy of the Police Report that she provided to the police department, but the College also chose not to do that.

118. Additionally, the College later did produce a copy of the Police Report, indicating that the College had it all along.

119.     Given how imperative this Title IX investigation was to the Plaintiffs, the College did not even make basic efforts to obtain critical information that was easily available to it, or that could have been easily made available to it.

120.     The Title IX Report states that during interviews with "four different witnesses" – although the report does not identify who these witnesses are – they "independently said that they believe something similar to this incident had happened to another woman on campus with the two (Plaintiffs) last fall.  W6 went so far as to indicate that the other woman wasn't as intoxicated as (Ms. Poe) so the (Plaintiffs) didn't have intercourse with her though they tried."  The Title IX Report does not identify these witnesses, does not indicate what the basis was for their alleged belief, does not question how these four witnesses allegedly came upon this information, does not question why one of these four witnesses did not go to College or police officials, and does not question critical differences between the alleged first incident and Ms. Poe's claims.

121.     The Title IX Report says, "Each of the four witnesses was asked to encourage the other student to come forward."

122.     What is unclear is why the Investigators engaged in gender discrimination when it made the decision to force a previous male witness to come forward with information but why it did not force these four witnesses – all of whom are believed to be female – to do the same. The Title IX Report indicated that one of the male witnesses, Mr. Molina, "only spoke with Investigators because the Title IX Coordinator told him that we were going to charge him with failure to comply through the student conduct system."

123.    However, the Investigators never made the same or similar threat to the four witnesses even though they declined to identify who this "other student" was who previously had an encounter with the Plaintiffs.

124.    The Title IX Report claimed that, "Even without talking to a second victim, the story of the second account of attempted assault strengthened (Ms. Poe's) credibility and further drew into question (Plaintiffs') behaviors."  In other words, a large part of the basis for the Investigators' determination about Ms. Poe's credibility, and ultimately their determination that a sexual assault took place, was based on a completely vague and unsubstantiated report of a second attempted prior sexual assault.

125.    What is instructive here is that the Investigators refer to a "second victim," even though the evidence – scant as it may be – by the four witnesses claims that this other student never actually had sex with either of the Plaintiffs, so it is unclear how she is a victim or labeled as much in the Title IX Report.

126.    What also is instructive is that the Investigators simply assumed that the four witnesses' account was accurate, even though there was no objective basis for establishing its veracity.  The College could have forced the four female witnesses to cooperate through threat of failure to comply – just as it had done with Mr. Molina – but the College chose not to do so.

127.    The Title IX Report concluded by stating that the Investigators "believe (Ms. Poe") drew a line of consent at some point in the night when she was with the (Plaintiffs) and that it is also possible that there was a point in the night when (Ms. Poe) did not have the capacity to consent to sex."  It is unclear where this line of consent was and how it was drawn.  Also

noteworthy is the College's use of the term "possible" rather than "probable," given that the College was working with a standard that was preponderance of the evidence.

128.    The Title IX Report stated that Ms. Poe claimed that Mr. Roe sexually assaulted her vaginally, while Mr. Doe concurrently forced her to perform oral sex on him.  Ms. Poe claimed that "she told the (Plaintiffs) to stop, that she wanted to go to sleep, and that she was too intoxicated to defend herself."  The March 2 Police Report that Ms. Poe wrote more than a month before the Title IX Report came out never indicated that Ms. Poe told Plaintiffs to stop or that she announced that she was too intoxicated to defend herself.

129.    The Title IX Report found that, "Based on the totality of the circumstances and the information obtained pursuant to this investigation, and based on a more likely than not standard of proof, we conclude that it is more likely than not that Respondent(s) violated System President's Procedure 4-120a."

130.    On April 6, 2015, at 2:17 PM, Ms. Black stated that Mr. Young received a message that a person believed to be Ms. Poe "has been making comments about having sex with a baseball player and feeling she was forced.  The baseball player is unidentified to Matt or me. Megan (believed to be Ms. Poe) has asked to meet with Mr. Young.  He is talking with Amanda (last name unknown) right now about getting help with this if Megan (believed to be Ms. Poe) does not bring this forward.  I understand she has met with Amanda to get connected with therapy over her trauma and about alcohol abuse.  Should she want to meet with Matt I am encouraging him to have Amanda part of the meeting."

131.    Numerous aspects of this interaction are noteworthy, starting with the fact that this e-mail came in on the same day that the Title IX Report was generated.

132.    Particularly noteworthy is that, by this time, Ms. Poe had already accused the two Plaintiffs, announced to her roommate on the morning of her claimed sexual assault, "Why does this always happen to me?" and now was claiming yet again that a baseball player had sexually assaulted her.

133.    On May 6, 2015, the College held an administrative hearing in absentia regarding the allegation that the Plaintiffs violated the Code through their actions on February 28.  The hearing was in absentia due to the Plaintiffs' not participating because, at the time of the investigation and hearing, the Plaintiffs had already been charged with multiple sexual assault charges that could lead to decades in prison.

134.    On May 7, 2015 – the very next day – Mr. Dennis Trujillo Johnson ("Mr. Johnson"), the College's Designated Student Services Officer, made the decision to expel the Plaintiffs from the College.  The brevity of the time between the hearing and the expulsion, especially in light of the seriousness of the situation and how it would drastically affect two young lives, shows that very little thought went into the decision to expel.  In fact, this short time period, during which no meaningful debate could have taken place, indicates that the decision to expel was pre-determined.

135.    Expulsion from the school constituted an "indefinite separation" from the College and made the Plaintiffs "ineligible for admission or re-admission at any of the community college(s) within the Colorado Community College System," according to the May 7 decision. The Plaintiffs could never attend another community college in the State of Colorado, thereby permanently destroying their future academic prospects.

136.    In its decision, Mr. Johnson further wrote: "Sexual misconduct and underage drinking are serious problems on college campuses, and such violations cannot be ignored or taken lightly.  The use of alcohol in a sexual misconduct case exacerbates the situation, making it necessary for the College to impose an expulsion."

137.    The College's decision is facially not credible.  Even through it was Ms. Poe who voluntary chose to drink even before she went to the room of the Plaintiffs on February 28 and even though she invited herself to their room, where she voluntarily engaged in sex with them, the College took no disciplinary action against Ms. Poe.

138.    Ms. Carmen Simone ("Ms. Simone"), in her role as President of the College, is responsible for supervising all decisions that have been made at the College with respect to the Plaintiffs.  Ms. Simone as Trinidad's president is charged with a duty of the proper implementation of statutory mandates under Title IX and with ensuring compliance therewith but failed to do so as applied to Plaintiffs and more generally all students at the School.  She also had the authority to overturn the expulsion of the Plaintiffs, but she chose not to do so. Ms. Simone is, therefore, culpable to the Plaintiffs in this matter.

139.    After the Plaintiffs were expelled from the College the criminal prosecution against them continued.  Later, all charges against them would be dropped and their records sealed.

140.    Prior to the dismissal and sealing, however, on December 16, 2016, Mr. Martinez provided testimony at a probable cause hearing that took place in the Las Animas County, Colorado, District Court.

141.    All of the information that Ms. Poe provided during this December 16 hearing was readily available to the College, its Investigators and its other officials during the course of

their investigation in the spring of 2015.  All they had to do was ask the questions of Ms. Poe. This means that the College and its agents either knew or should have known of all of the information below.

142.    During the December 16, 2016, hearing, Ms. Poe made numerous critical admissions.

143.    She admitted that Mr. Roe had previously said to her that he, Mr. Doe and Ms. Poe would all have a threesome together, and that Mr. Doe had hinted to her on previous occasions that he was interested in sex with her.  She also admitted that she previously had been to the Plaintiffs' dorm room on other occasions.

144.    Ms. Poe admitted that there were times prior to February 28, 2015, that she would text Mr. Roe and ask for permission to come over so that she could "lay" and "cuddle" with him.

145.    She further admitted that it may have been her – rather than either of the Plaintiffs – who initiated the request for her to come over to the Plaintiffs' dorm room on February 28, 2015.  This information was available in Ms. Poe's text exchanges on her phone with Mr. Roe. The College had these text exchanges during the course of its Investigation.  In fact, the text exchanges show that on February 28 at 2:16 AM, Mr. Poe sent two texts to Mr. Roe.  One said, "Look for me," and the other said, "I'm coming over."

146.    Ms. Poe admitted that she was "really upset" that evening because Mr. Molina, a friend of the Plaintiffs', had expressed to her that he would not reciprocate her romantic interest in him.  She claimed that Mr. Molina would go on to "dis" (disrespect) her that evening.  She was so upset that she ended up crying to her roommate, Ms. Jolinalynn Achiu ("Ms. Achiu"),

that night.  She admitted that she wanted to see both of the Plaintiffs because she was upset about the events with Mr. Molina.

147.    Ms. Poe admitted that when she came over at 2:21 AM on the morning of February 28, she was not drunk.

148.    Ms. Poe stated that the walls of the dorm rooms in the residence halls were so thin that it is possible to hear what is going on in adjacent rooms.  Given that College officials were familiar with the campus, they knew of this.  They also knew that security guards would patrol the campus at all times of the evening and that there were numerous cameras that were taping the campus.

149.    When she arrived in the room, which had three windows, the room was lighted, there was music playing and she began to dance.

150.    Ms. Poe admitted that she had previously gone to the Plaintiffs' room when she was intoxicated on various occasions before February 27, 2015.  She also admitted that, on the evening of February 27, she wanted to go over to the Plaintiffs' room and play a game called "King's Cup."  Information about this game is very easy to find on the Internet, and the objective of this game is to become intoxicated.

151.    She admitted that the Plaintiffs did not force her to drink.  She also admitted that she was never hit or struck by either of the Plaintiffs, nor was she ever injured by either of the Plaintiffs.  This further supports the notions that any kind of physical force were used against Ms. Poe or any kind of physical injuries were sustained by her were figments of the College's imagination rather than a reflection of what she ever told College officials.  In fact, Ms. Poe

would admit that there were no marks on her at all as a result of the interaction with the Plaintiffs, and the SANE report would support this admission.

152.   Ms. Poe admitted that, during sex with the Plaintiffs, she never screamed at any point.  She further admitted that the Plaintiffs never prevented her from leaving, which is further supported by evidence that the College had in its possession during the Investigation.

153.   She admitted that she could have gotten up from sex with the Plaintiffs but chose not to.  She claimed the reason that she chose not to is because she was scared.  When asked why she was scared, she said, "I don't know.  They were talking Spanish and I really don't understand Spanish."  During the College investigation, it was revealed that Ms. Poe's purported fear of the Plaintiffs was based exclusively on her claim that they were speaking Spanish during sex with Ms. Poe.  The Plaintiffs both speak fluent English, and they always communicated with Ms. Poe in English in the past.  Ms. Poe, who is Caucasian, never indicated that she asked them to communicate in English during the sex, even though she easily could have done so.

154.   Ms. Poe claimed that she went to the Mt. San Rafael Hospital in Trinidad to get a rape kit done on her after she spoke to her aunt.

155.   While she was at the hospital, police officer John Massarotti ("Mr. Massarotti") interviewed her.  She refused to be filmed by him during the interview.  She also refused to have him take photos of her during the interview.

156.   During the probable cause hearing on December 16, 2016, the College's Title IX investigator at the time and current Dean of Enrollment Management, Mr. Robert Martinez,

who was instrumental in the Title IX Report that ultimately led to the expulsion of the Plaintiffs, was questioned.

157.    Mr. Martinez viewed the Video, but he never made a copy of it.

158.    Mr. Martinez testified that all the Video showed was a conversation between the Plaintiffs and Ms. Poe.  He further testified that the conversation "wasn't aggressive."

159.    Prior to his testimony, Mr. Martinez had written in his Title IX Report of April 6, 2015, that Ms. Poe was following the Plaintiffs and yelling at them.  However, on the witness stand, Mr. Martinez testified that he could not tell from the video whether Ms. Poe was yelling at them.

160.    Mr. Martinez testified that he spoke to at least three witnesses whose impression it was, based on talking to Ms. Poe, that sex with the Plaintiffs was consensual.

161.    Mr. Martinez did not make an audio recording of his conversations with the three witnesses.

162.    Mr. Martinez also admitted that he did not direct College security officer Joe Lukow ("Mr. Lukow") to perform any kind of an investigation.

163.    Mr. Lukow also testified.  At the time, Mr. Lukow was a police officer with the La Jara Police Department and had been since 2009.  He also worked part time as a security officer at the College.

164.    It is unclear why Mr. Martinez did not ask Mr. Lukow, a trained police officer at that point with years of experience, to prepare a report in aid of the Title IX investigation.

165.    He testified that he was the person, previously identified as Security Guard, who had run into Ms. Poe twice between the late evening of February 27 and the early morning of

February 28, including between 1 AM and 2 AM on February 28. He stated that it was his opinion that she was not intoxicated "at all."

166.    This directly contradicts the conclusion of the Title IX Report, which claims that it was probable that Ms. Poe was intoxicated when she came over to see the Plaintiffs in their dorm.

167.    Mr. Lukow testified that, during the course of the Title IX investigation, he complained to Ms. Black because he was being kept out of the investigation – even though he was the one who was working the evening of the assault Ms. Poe claimed and even through Ms. Poe's mother had contacted him to complain that Ms. Poe had been assaulted. Mr. Lukow claimed he was "a little upset" about this. He was never even allowed to review the surveillance Video that Mr. Martinez had viewed.

168.    Mr. Lukow testified that "most of the kids know what time we (security) get off of security." He said his shift ended at 3 AM on the morning of February 28, and that there would not be security on campus until 4:30 in the afternoon that day.

169.    Mr. Lukow testified that the company that subcontracted him to work security for the College provided him with a company cell phone, and that this cell phone number was provided to every student on the College campus in case of emergency. Ms. Poe never called him.

170.    Also testifying was Ms. Jasmine Iveth Fernandez ("Ms. Fernandez"), who was 20 at the time of giving testimony and was a friend of Ms. Poe's. She previously attended the College, and she was friends with the Plaintiffs and with Ms. Poe. She once lived one floor above Ms. Poe in O'Connor hall. She also knew Ms. Achiu, who was Ms. Poe's roommate at

the time of her claimed assault.  Ms. Fernandez said she was "good friends for a good amount

of time" with Ms. Poe.  She also knew Ms. Poe's family, even staying overnight at Ms. Poe's

home during Halloween of 2014.

171.    In the fall of 2014 during Halloween, Ms. Poe, Mr. Roe and Ms. Morgan Hamilton

("Ms. Hamilton"), a friend of Ms. Fernandez's and her roommate at O'Connor Hall in the fall

of 2014, drove from Trinidad to CU Boulder.  There also were two other males – identified as

"Marion" and "Edgar" – who accompanied them.

172.    Ms. Fernandez testified that, during this trip, Mr. Roe stayed overnight at Ms. Poe's

parents' home in Littleton, Colorado.

173.    Ms. Fernandez testified that Ms. Poe's father provided alcohol to both of them, who

were 18 at the time, and others at the house.

174.    Ms. Fernandez spoke to Ms. Poe in the spring of 2015 about the incident that had

transpired with the Plaintiffs.  They had this conversation when Ms. Fernandez drove to

Trinidad to visit Ms. Poe and Ms. Hamilton.  This was either in late March of early April of

2015.

175.    Ms. Fernandez and Ms. Poe met at O'Connor Hall, and Ms. Poe privately pulled

her aside and told her that she had sex with the Plaintiffs.  Ms. Poe never told Ms. Fernandez

that the sex was against her will or that she was otherwise forced into any sexual acts.  Ms.

Fernandez claims the conversation lasted roughly five minutes.  Ms. Fernandez said she was

"shocked" by Ms. Poe's revelation.  She claims that Ms. Poe was very forthcoming with the

information about the sex and brought it up to Ms. Fernandez almost immediately after they

started talking.

176.   These witnesses and the information they provided were all available to the College at the time of its Title IX Investigation.

## A.   THE TRINIDAD STUDENT HANDBOOK

177.   The Trinidad Student Handbook Notice of Non-Discrimination purports that the School "prohibits all forms of discrimination and harassment including those that violate federal and state law, or the State Board for Community Colleges and Occupational Education Board Policies 3-120 or 4-120." It adds, "The College does not discriminate on the basis of sex/gender, race, color, age, creed, national or ethnic origin, physical or mental disability, veteran status, pregnancy status, religion, genetic information, gender identity, or sexual orientation in its employment practices or educational programs and activities."

178.   The College's Handbook further provides that it "is an equal opportunity educational institution and does not discriminate on the basis of race, color, creed, national origin or ancestry, sex, veteran status, age, sexual orientation, or disability in employment in its activities, programs, or employment practices as required by Title VI, Title IX, and Section 504, Age Discrimination Act, and Title II of the ADA."

179.   It further provides, "TSJC does not unlawfully discriminate on the basis of race, color, religion, national origin, sex, age, or disability in admission or access to, or treatment, or employment in its educational programs or activities."

180.   Later, the Handbook provides in the Grievance and Investigation Process:

Board Policy (BP) 3-120 and BP 4-120 provide that individuals affiliated with the System or Colleges shall not be subjected to unlawful discrimination and/or harassment on the basis of sex/gender, race, color, age, creed, national or ethnic origin, physical or mental disability, veteran or military status, pregnancy status,

religion, genetic information, gender identity, sexual orientation, or any other protected category under applicable local, state, or federal law (also known as "civil rights laws"), including protections for those opposing discrimination or participating in any grievance process on campus or within the Equal Employment Opportunity Commission,  the U.S. Department of Education Office for Civil Rights, or other human rights agencies, in its employment practices or educational programs and activities.

181.    BP 4-120 provides for a "zero tolerance policy for sex/gender-based misconduct," and provides for the College's grievance process.  It applies to sexual misconduct, which is defined as sexual harassment or non-consensual contact in the broadest sense possible.  BP 4-120 is replete with incorporations of the Colorado Criminal Code, C.R.S. Title 18.

182.    SP 4-30 provides the procedures applicable to the System and College's disciplinary process.  Generally, the College disciplinary process begins with a complaint on- or off-campus conduct allegedly violating the College's Code of Conduct.   The alleged perpetrator is afforded an opportunity to respond.  An investigation follows, at which point the School may or may not take interim action.  A decision is made by the school and sanctions, if appropriate, are rendered.

183.    The alleged perpetrator afterward may appeal any sanctions.  The original findings and sanction are presumed to have been decided reasonably and appropriately.   Appeals decisions are to be deferential to the original decision, making changes to the findings only where there is a clear error and a compelling justification to do so.  The sole grounds for appeal are: (1) a material procedural or substantive error occurred that significantly impacted the outcome of the hearing, and (2) new evidence which was unavailable during the investigation or hearing that could substantially impact the original finding or sanction.

184.    Hearings under the Code of Conduct are considered "entirely administrative in in nature and are not considered legal proceedings."

185.    At any disciplinary hearing, the alleged perpetrator of misconduct's rights are more constrained than they otherwise would be in a criminal trial.  A student is not afforded legal representation; a student only may be accompanied by an advisor at his or her own expense. A student may not be represented by an attorney or law student unless civil or criminal actions concerning the particular incident in question are pending.  However, the legal counsel's role is one of an advisor only.  A student in the School's disciplinary process's legal counsel is not permitted to speak or to participate directly in any hearing except when the student is under eighteen years old or incapacitated.

186.    Importantly, SP 4-30 requires an alleged perpetrator to present "his/her own case." SP 4-30 is unclear as to why a student in the position of a criminal defendant is required to assert a case-in-chief to undermine whatever case the School asserts.

187.    Student disciplinary hearings under SP 4-30 "may be carried out prior to, simultaneously with, or following civil or criminal proceedings off-campus."

188.    The burden of proof the College uses in student disciplinary hearings is a preponderance of the evidence, a more-likely-than-not standard.  The School's disciplinary processes and procedures omit entirely a clear statement as to when in the process a hearing is required to take disciplinary action prior to appeal.

189.    The record of all disciplinary actions purportedly, "will remain confidential, separate from [a student's] disciplinary record and maintained by the Code of Conduct Officer."  Only authorized persons may review the records.  All disciplinary records will be

maintained for a minimum of five years after resolution of the disciplinary process, when the records "will be destroyed, unless mitigating circumstances exist as determined by campus administration."

190.    However, such records expressly may be reached through a waiver under the Family Education Rights and Privacy Act of 1974, 20 U.S.C. § 1232g ("FERPA"), 34 C.F.R. Part 99, or through court order or subpoena.  FERPA permits schools, without a student's consent, to disclose a student's disciplinary records to other schools to which a student is transferring.

191.    Nearly all post-secondary institutions of higher learning require applicants to sign and provide a FERPA waiver for enrollment.

192.    The Plaintiffs still wish to attend an institution of higher learning, but thus far have been discouraged from doing so because they know that they would be required to execute a FERPA waiver, which would then provide access to any such institution with knowledge of the Plaintiffs' disciplinary background.  A disclosure to another institution of higher learning by the Plaintiffs that they had been expelled for a sexual assault would make it functionally impossible for the Plaintiffs to attend any other institution of higher learning.  Therefore, the College's expulsion has served as *de facto* expulsion from every other college.

## IV.    CLAIMS AND CAUSES OF ACTION

### A.    FIRST CLAIM FOR RELIEF
***(CLAIM FOR RACE-BASED DISCRIMINATION PURSUANT TO 42 U.S.C. § 1981
BROUGHT THROUGH 42 U.S.C. § 1983 –ALL DEFENDANTS)***

193.    Plaintiffs reincorporate and reallege all other paragraphs as if fully set forth herein.

194.    42 U.S.C. § 1981(a) provides:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

195.    To establish a claim under § 1981, a plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.).  *Mian v. Donaldson, Lufkin & Jenrette Securities Corp.*, 7 F.3d 1085, 1087 (2d Cir. 1993).

196.    To state a claim under § 1981, a plaintiff must identify the actual loss of a contract. *Shawl v. Dillard's Inc.*, 17 Fed. Appx. 908, 911 (10th Cir. 2001).

197.    A university's decision to expel a student "is tantamount to the termination of that contract because it deprived plaintiff of the enjoyment of the 'benefits, privileges, terms, and conditions of the contractual relationship.' 42 U.S.C. § 1981(b)."  *Williams v. Lindenwood University*, 288 F.3d 349, 357 (8th Cir. 2002).

198.    To prove intentional discrimination under § 1981, a plaintiff may employ a cat's paw theory of discrimination in which decision-makers act dismiss a student based on racially discriminatory accusations without proper investigation.  *Sirpal v. University of Miami*, 684 F.Supp.2d 1349, 1356-59 (S.D.Fl. 2010).

199.    Damages claims for violations of § 1981 by state actors are brought under § 1983. *Bolden v. City of Topeka, Kan.*, 441 F.3d 1129, 1137 (10th Cir. 2006).

200.     Plaintiffs are male and racial minorities of Latino descent.  Defendants were aware of Plaintiffs' racial backgrounds.

201.     Plaintiffs' payment of tuition and attendance and enrollments at the System and School constituted contracts incorporating the various policies put in place by the System and School, as well as the Student Handbook.

202.     At all relevant times to this Complaint, Defendants acted pursuant to their System and School policies promulgating their statutory mandate under Title IX to investigate a false claim of sexual assault.

203.     Defendants, after a sham investigation pursuant to their Title IX roles, ultimately expelled them from the School.  Defendants expelled Plaintiffs specifically because of their racial backgrounds.

204.     Defendants heavily relied on the accuser's assertion that she was frightened of Plaintiffs because they spoke Spanish while engaged in a sexual act with the accuser.  The accuser admitted that this was the only reason she was frightened of the Plaintiffs.  By relying heavily on the accuser's racially based fear, the Defendants' actions against the Plaintiffs were racially motivated and discriminatory.

205.     Defendants' reliance on the racially discriminatory accusations of accuser demonstrates their intentional race discrimination under a cat's paw theory.

206.     Given how the evidence in this matter overwhelmingly supported a conclusion that the Plaintiffs did not engage in any wrongful conduct against the accuser, the Defendants did not have a nondiscriminatory reason for expelling the Plaintiffs and denying them of education, housing, and food.

207.    The inadequacy of Defendants' investigation and the paucity of evidence supporting the investigation's conclusion demonstrates that the non-discriminatory reasons offered by Defendants to support expulsion of plaintiffs are pretext for intentional race discrimination.

208.    On information and belief, students of Caucasian backgrounds in positions similar to that of Plaintiffs in Title IX investigations at the School and System have been treated differently by the School and System.  Caucasian students in Title IX investigations have been subject to dissimilar, less-severe punishments, pains, penalties, and sanctions.

209.    As the Title IX investigators, Defendants Casey Sacks and Robert Martinez intentionally discriminated against Plaintiffs on the basis of race by accepting the accuser's racially discriminatory accusations.

210.    The inadequacy of the investigation conducted by Defendants Casey Sacks and Robert Martinez demonstrate that the non-discriminatory reasons offered for Plaintiffs' expulsions are mere pretext for impermissible race discrimination.

211.    Defendant Dennis Trujillo Johnson, as Designated Student Services Officer, signed the expulsion letter that terminated Plaintiffs' contracts with the college.

212.    Defendant Dennis Trujillo Johnson, by signing off on the expulsion based on the Title IX investigation intentionally discriminated against Plaintiffs on the basis of race due to the impermissible racial animus expressed by the accuser and adopted by the investigation.

213.    Defendant Lorrie Velasquez, as Title IX Coordinator, was involved in the Title IX investigation that ultimately led to Plaintiffs' expulsion and communicated with Plaintiffs throughout that investigation.

214.    As Title IX Coordinator and by participating in the Title IX investigation, Defendant Lorrie Velasquez intentionally discriminated against Plaintiffs on the basis of race due to the investigation's adoption of the impermissible racial animus of the accuser.

215.    Defendant Kerry Gabrielson, as Vice President of Student Services, was involved in the investigation that was tainted by the accuser's impermissible racial animus.   By participating in the investigation, Defendant Gabrielson intentionally discriminated against Plaintiffs on the basis of race.

216.    Defendant Michelle Black, as Director of Student Life, was involved in the investigation and wrote a report of her involvement.  By participating in the investigation that led to plaintiffs' expulsions, Defendant Black intentionally discriminated against Plaintiffs on the basis of race because the investigation adopted the racial animus of the accuser.

217.    Defendant Matt Young, as Director of Housing, participated personally in the investigation that led to Plaintiffs' expulsions.  Defendant Young received a report of the alleged incident and then submitted a report to the college as part of the investigation.  By being personally involved in the investigation that was tainted by accuser's racial animus and adopted that racial animus, Defendant Young intentionally discriminated against plaintiffs on the basis of race.

218.    Defendants violated clearly established law.

219.    At the time of plaintiffs expulsion, clearly established law existed that § 1981 prohibits intentional race discrimination including intentional discrimination that occurs after the formation of the contract, including termination of the contract.  *Perry v. Woodward*, 199 F.3d 1126, 1131-34 (10th Cir. 1999).

220.    Plaintiffs' expulsions deprived them of the loss of the use, enjoyment, and benefit of their Enrollment Agreements.   The expulsions deprived Plaintiffs of: educational enrichment; various School-provided educational resources to facilitate the learning process such as fifteen-to-one student-to-faculty ratios; School-based athletic event participation; School-provided Residence Life, including but not limited to environments conductive to the creation of respectful and supportive learning communities in residence halls; various School-sponsored academic, financial, and technology resources; and all other aspects of a normal student's educational career at the School.

221.    The discrimination identified above caused plaintiffs damages, including but not limited to the loss of the use, enjoyment, and benefit of their enrollments with the School.

### B.      SECOND CLAIM FOR RELIEF
### (*DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF – ALL DEFENDANTS*)

222.    Plaintiffs reincorporate and reallege all other paragraphs as if fully set forth herein.

223.    The System and School breached the terms of the Enrollment Agreement with Plaintiffs.

224.    The System and School's actions in this matter violate Title IX.

225.    The parties have a dispute about whether the System and School have acted in breach of its contractual obligations under the Enrollment Agreements and whether it is in violation of Section 1981.

226.    The System and School's continued actions against Plaintiffs have caused and are continuing to cause substantial, immediate, and continuing damages, including but not limited to lost educational opportunities and future lost wages.

227.     Expulsion from the School has caused Plaintiffs to be denied the benefits of education at their chosen school and their participation in extracurricular school-sponsored activities, is affecting their ability to reenroll at other institutions of higher education, has damaged their academic and professional reputations, and has damaged their abilities to pursue careers.

228.     As outlined above, Plaintiffs have demonstrated a substantial likelihood of success on the merits with respect to their Section 1981 breach of contract claims.

229.     The System and School's conduct caused and will continue to cause Plaintiffs irreparable injury in the loss of educational opportunities, the prohibition of transferring to partake in other educational opportunities, and the loss of future wages and enjoyment of life, liberty, and pursuit of happiness.   Due to the factual allegations described above, monetary damages alone cannot compensate Plaintiffs fully for the harms suffered.   Economic damages and lost future earnings may be difficult to quantify.   They will never get these lost-education years back and may never realize the economic gains lost from their lack of participation in the workforce.

230.     The grant of injunctive relief exposes no harm to the School and System.   They are prohibited from disclosure except upon the limited exceptions as outlined in the FERPA.   The educational disciplinary records contemplated in this request are already kept confidential by the System and School.   However, Plaintiffs seek the prohibition of disclosure of these records to afford them the opportunity to transfer to other educational institutions if not restored to the position they were prior to the conduct alleged above.   The disciplinary records serve a substantial bar to their admissions to other institutions of higher learning.

231.    For the same reasons, granting injunctive relief will not disserve the public interest. On the other hand, the injunctive relief requested serves the public interest as outlined in the FERPA.

232.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and Federal Rule of Civil Procedure Rule 57, Plaintiffs seek declaratory judgment in their favor and against the System and School on the Title IX claims and breach of contract claims above during the pendency of the determination of the economic claims.  Such a determination would serve a useful purpose in clarifying and settling legal relations in issue and will terminate and afford relief from uncertainty, insecurity, and controversy giving rise to this proceeding.

233.    Pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202 and Federal Rules of Civil Procedure Rule 65, Plaintiffs request an injunction restoring them as students in good standing at the School, prohibiting disclosure of their educational disciplinary records to other schools at which they may apply, and clearing their educational disciplinary records.  No other remedy at law permits Plaintiffs to mitigate adequately their damages and stem the tide of continuing and further harm.  For the reasons described above, Plaintiffs have a substantial likelihood of success on the merits on the ~~Title IX claims and~~ Section 1981 breach of contract claims, a substantial threat exists that they will suffer irreparable injury if the injunction is not granted, the threatened injury to them outweighs the harm on the System and School, and granting the injunction will not disserve the public interest.

## V.       DAMAGES

234.    The College and System's discriminatory and retaliatory conduct described above, and that of the individual defendants, has caused the plaintiff the following damages:

   a.   Lost back pay, wages, and benefits in amounts to be established at trial;

   b.   Lost front pay, future wages, and benefits in amounts to be established at trial;

   c.   Lost education opportunities;

   d.   Lost educational opportunity cost in amounts to be established at trial;

   e.   Emotional upset, stress, and anxiety in an amount to be established at trial;

   f.   Out-of-pocket expenses, litigation costs, and attorney fees in amounts to be established at trial.

235.    Defendant's violation of Title VII was willful, entitling the Plaintiffs to an award of punitive damages to the fullest extent permitted by law.

236.    Defendants' breaches of contract were willful entitling them to recover damages for emotional distress.


## VI.       REQUEST FOR RELIEF

Plaintiffs request that the Court enter judgment in their favor and against Defendants as follows:

237.    Awarding them special damages for lost wages, benefits, and out of pocket expenses in amounts to be established at trail;

238.     Awarding them general damages for emotional distress in an amount to be established at trial;

239.     Punitive damages, pursuant to 42 U.S.C. §§ 1981, 1983, 1988 and 2000(e) and 20 U.S.C. § 1681, in the maximum amount permitted by law as applied to each defendant;

240.     Awarding them reinstatement, or in lieu of reinstatement, lost future wages and benefits in an amount to be established at trial;

241.     Awarding them statutory and reasonable attorney fees, litigation expenses, and costs incurred in this action under 42 U.S.C. §§ 1981, 1983, 1988 and 2000(e) and 20 U.S.C. § 1681;

242.     Awarding them prejudgment interest on their lost wages award and economic loss; and

243.     Awarding them any additional and further relief that the court finds equitable, appropriate, or just.


DATED: October 15, 2018


Igor Raykin, Esq., Atty. Reg. #: 43081
Kishinevsky & Raykin, Attorneys at Law
2851 South Parker Road, Suite 150
Aurora, CO 80014
Telephone: (720) 748-8888
E-mail: igor@coloradolawteam.com
Attorney for Plaintiffs

_s/Michael Nolt_____
Michael Nolt, Esq., Atty. Reg. # 50668
2851 S. Parker Rd., Suite 150
Aurora, CO 80014
Phone: 720-748-8888
E-mail: michael@coloradolawteam.com
Attorney for Plaintiffs